[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-16607

_____

D.C. Docket No. 5:14-cv-00358-LJA

BRENDA SMELTER,

Plaintiff - Appellant,

versus

SOUTHERN HOME CARE SERVICES INC,
d.b.a. Rescare Homecare,

Defendant - Appellee.

_____

Appeal from the United States District Court
for the Middle District of Georgia

_____

(September 24, 2018)

Before WILLIAM PRYOR, JILL PRYOR and ANDERSON, Circuit Judges.

JILL PRYOR, Circuit Judge:

Brenda Smelter, a black woman, was hired by Southern Home Care Services, Inc. d/b/a/ ResCare Homecare as a Customer Service Supervisor. She was the only black person who worked in her office, and she often overheard her co-workers making racist comments, some of which were directed at her. The severity of these racist comments peaked on the last day of her employment when a co-worker called her a "dumb black nigger" during an argument. According to Smelter, she was fired for reporting this epithet, along with her co-workers' other racist comments, to her direct supervisor. She sued Southern Home under Title VII and 42 U.S.C. § 1981, asserting claims for discriminatory termination, hostile work environment, and retaliation. The district court granted summary judgment for Southern Home on each of Smelter's claims, and Smelter appealed.

After careful review, and with the benefit of oral argument, we affirm in part and reverse in part. We agree with the district court that Smelter's discriminatory termination and retaliation claims fail as a matter of law because she provided insufficient evidence of pretext in response to Southern Home's legitimate, nondiscriminatory reasons for terminating her. But we disagree with the district court's conclusions that, as a matter of law, the harassment Smelter suffered was not severe or pervasive and Southern Home lacked notice of that harassment. We therefore reverse the grant of summary judgment for Southern Home on Smelter's

2

hostile work environment claim and remand that claim to the district court for further proceedings.

## I.    BACKGROUND

### A.    Southern Home and Its Perry Office

Southern Home provides personalized home health care services for people of all ages, physical conditions, and cognitive abilities.  Its caregivers travel to clients' homes to provide personal care services and other assistance as requested. These home visits are managed by Southern Home's Customer Service Supervisors, who coordinate with clients and caregivers to schedule the visits and to ensure that clients receive the requested services.

Customer Service Supervisors coordinate with caregivers in two ways. First, they provide caregivers with client care plans and other information pertaining to their scheduled visits.  If a client cancels or reschedules a visit, or if a caregiver is added to or removed from a schedule, the Customer Service Supervisor is responsible for relaying that information to the caregiver, usually by calling the caregiver directly.  Second, Customer Care Supervisors ensure that caregivers' work time is accurately reported for payroll purposes.  Caregivers are supposed to report when their client visits begin and end by calling in to an automated system called Telephony.  Sometimes, however, caregivers fail to use Telephony and have to call a Customer Service Supervisor, who then records the

3

caregivers' time manually.  Regardless of how the caregivers report their time, Customer Service Supervisors are responsible for "linking" the reported time with the master client schedule to ensure that the caregivers are properly compensated. Because linking is easier for the Customer Service Supervisors if the caregivers use Telephony, the Customer Service Supervisors are responsible for making sure they do so.

During the time period relevant to this case, Southern Home operated out of several branch offices in Georgia, including one in Perry.  Executive Director Kelly McDougal oversaw operations at Southern Home's branch offices across middle Georgia, including the Perry office.  Although McDougal provided general oversight, the Perry office fell under the direct management of Branch Manager Brandi Talton.  Prior to Smelter's hire, in addition to Talton, four other employees worked at the Perry office:  Connie Raleigh, the Office Manager; Catherine Smallwood, a Customer Service Supervisor; Vanessa Lind, another Customer Service Supervisor; and Mary Noll, a nurse.  McDougal, Talton, and all of the other Perry office employees are white.

In addition to her duties at the Perry office, Talton also supervised marketing and helped with operations at the Macon office.  This meant that she often was absent from the Perry office while working in Macon or out in the field developing clients.

4

**B.    Smelter's Hiring**

In April 2013, Southern Home accepted applications to fill a vacant Customer Service Supervisor position in the Perry office.  The vacant position had been occupied by Lind, but it opened up when Lind went on maternity leave.  Smelter applied for the open position, and McDougal hired her.  Smelter's employment was subject to a six month probationary period.

Smelter began a week of orientation and training on July 2, 2013.  Even though Smelter was hired to work in the Perry office, her orientation and training took place in the Macon office, as was customary for all new hires.  Typically, new Customer Service Supervisors would receive step-by-step training on payroll, timesheets, and Telephony.  This would include a full week of one-on-one training with Southern Home's lead Customer Service Supervisor, Merri Jo Hortman.  According to Hortman, Smelter received the customary amount of training and indicated that she was comfortable with the requirements of her new position before leaving training in Macon and taking up her position in Perry.  Smelter, in contrast, testified that she received "no training in Macon at all" because the employees were in the middle of payroll and "didn't have time."  Doc. 27 at 144, 155.[1]

---

[1] Citations to "Doc. #" refer to numbered entries on the district court's docket.

While Smelter was in training at the Macon office, she claimed that $100 was stolen from her purse while it was stored in a co-worker's desk. Although Smelter did not know who was responsible, she accused the co-worker and notified McDougal and Talton. McDougal investigated Smelter's claim but was unable to determine who, if anyone, stole the money. McDougal told Smelter that she would be fired if she continued to talk about the alleged theft.

## C.     Smelter's Post-Training Performance

By Smelter's own admission, she struggled with her job duties after she left training and began working in the Perry office. She testified that she did the best she could to learn Southern Home's computer system, but did not "g[e]t it" until Raleigh started helping her. *Id.* at 158. Even then, she "still had some issues" with caregivers failing to clock in and out using Telephony. *Id.* at 158-59. In late July, a few weeks after she began working at the Perry office, Smelter told Talton that she still was struggling with Telephony and felt that she had not received enough training. Because of Smelter's difficulties, Talton asked Hortman to travel to the Perry office to provide Smelter with supplemental training. This was the first time that Hortman had been asked to provide a Customer Service Supervisor with additional training beyond orientation.

Smelter's supervisors and co-workers observed Smelter continuing to have performance issues. In particular, Smelter was having trouble understanding how

6

to do linking, so Talton asked Raleigh to help her.  Raleigh explained that, of all the Customer Service Supervisors with whom she had worked, Smelter required the most retraining.  At times, Raleigh would do some of the Customer Service Supervisors' linking for them, but Smelter needed the most help.  Raleigh testified that Smelter never "totally" understood Southern Home's computer system and that her skills on that system "were not that good."  Doc. 33 at 133, 139.

Like Raleigh, Talton observed Smelter struggling with her core duties like linking and scheduling.  Smelter repeatedly asked Talton the same questions and made the same errors, even though Talton had instructed her to take notes so that she could remember what she had learned.  McDougal was aware of Smelter's performance problems because Talton communicated "[e]verything" to her, and both Talton and Raleigh were "[c]onstantly" reporting Smelter's errors.  Doc. 32 at 15, 26.  McDougal testified that none of the other Customer Service Supervisors under her direction struggled with linking as much as Smelter did.

In addition to her struggles with Southern Home's computer system, Smelter also had difficulty coordinating with caregivers.  In early September—two months into her employment—Smelter caused a caregiver to be late to an appointment with a new client because she failed to timely provide the caregiver with the client's address.  Smelter received a written warning as a result of this incident.  The very next day, Smelter failed to inform the same caregiver about a client's

7

schedule change, which caused the caregiver to arrive at the client's house three hours early.

## D.    Smallwood's and Raleigh's Racist Comments

Smelter endured racist remarks by her co-workers nearly every day that she worked in the Perry office.[2]  Smallwood made most of these remarks.  For example, Smallwood told Raleigh that black men were "lazy" and "the scum of the earth."  Doc. 27 at 190.  Smallwood also said that "black women[] ha[d] babies on welfare," President Barack Obama's "big ears" made him "look[] like a monkey," and she did not know that black people could be buried on Sundays.  *Id.* at 190, 297.  On one occasion, Smallwood said that Smelter's hair made her look like a "mixed monkey" from the movie *Planet of the Apes*.  *Id.* at 296.

Raleigh made racist remarks, too.  She once described an occasion when she saw black people exiting a bus at a Wal-Mart store and commented that it looked like they were "chained together."  *Id.* at 193.  Raleigh added that she wished she could "send them all back . . . to Africa."  *Id.*

Smelter never reported any of these comments to McDougal, Talton, or any other supervisor at Southern Home until the last day of her employment.  But she testified that Talton overheard at least some of the remarks.  According to Smelter,

---

[2] Smelter's co-workers deny making these remarks, but because we are reviewing the grant of Southern Home's motion for summary judgment, we consider the facts in the light most favorable to Smelter, the non-moving party.  *See Jones v. UPS Ground Freight*, 683 F.3d 1283, 1291-92 (11th Cir. 2012).

Smallwood's and Raleigh's racist comments were "funny to everybody that worked in the Perry office" with her, "even Brandi Talton." *Id.* at 34.

### E.    Smelter's Termination

Smelter's final day of employment with Southern Home was September 9, 2013. On that day, a caregiver reported that Smelter again had failed to notify her about a client's schedule change. Smelter insisted that she had reported the schedule change to the caregiver and asked Smallwood to confirm because she believed that Smallwood had overheard her conversation with the caregiver. But Smallwood told Smelter that she did not remember it. A verbal altercation between Smelter and Smallwood ensued. Smallwood told Smelter to "shut up and get out of my office." *Id.* at 249. Smelter tried to explain that she was "just trying to make sure that [she] got everything documented," but Smallwood "jumped up . . . in a rage" and said "get out of my office . . . you dumb black nigger." *Id.* As Smallwood stood up, she "hit the desk" like she was about "to charge at" Smelter. *Id.* The altercation ended when Smelter left Smallwood's office.

Talton, who was out of the office, learned about the incident from Raleigh, who emailed Talton to report that Smelter was "in the back [of the office] yelling at [Smallwood]." Doc. 35 at 77-78. Talton then called the Perry office and spoke with Smelter and Smallwood in turn. Afterward, Smelter spoke with Talton for a second time and explained that it was Smallwood, not herself, who was being

9

difficult. Smelter testified in her deposition that she told Talton "everything that went on." Doc. 27 at 250. Although during the deposition she did not explain what she meant by this, she clarified her testimony in a declaration filed after Southern Home moved for summary judgment:

> When I said "everything that went on" I meant that I told Ms. Talton about the all [sic] racial statements made in the office including, but not limited to, the comments about black men being lazy and black women being on welfare to [sic] [Smallwood] telling me to get out of her office and calling me a "dumb black nigger."

Doc. 24-1 ¶ 3. Contradicting Smelter's assertion in her declaration, Talton testified that Smelter never told her about any of the racist comments.

After her second conversation with Smelter, Talton called McDougal and told her that Smelter and Smallwood had been fighting and that Smelter had "started it." Doc. 32 at 55. McDougal testified that Talton never told her about Smelter's reports of Smallwood's racist comments in the office. After speaking with Talton, McDougal consulted with human resources personnel and decided to terminate Smelter. McDougal then instructed Talton to go to the Perry office and fire Smelter. According to Talton, McDougal's reasons for terminating Smelter were that her client care was poor, she had been yelling in the office, her client schedules often were incorrect, and there was "[j]ust a lot of chaos in the office" when she was there. Doc. 35 at 79-80.

10

When she arrived at the Perry office, Talton completed Smelter's termination paperwork then met with Smelter and told her that she was fired. Smelter asked Talton why she was being fired when Smallwood was the one using racial slurs, but, according to Smelter, Talton never provided a reason. The termination form—which both Talton and Smelter signed—indicated, however, that Smelter was "not a good fit for the organization." Doc. 21-7 at 53-54. It also noted that Smelter was still within her probationary period.

After Smelter's termination, Lind returned to the Perry office from maternity leave. Talton hired Megan Valasky, a white woman, as a new Customer Service Supervisor for the Perry office.

## F.    Procedural History

Smelter sued Southern Home under Title VII, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981, asserting claims for discriminatory termination, hostile work environment, and retaliation.[3] The district court granted summary judgment for Southern Home on each of Smelter's claims. The court first concluded that Smelter had waived her discriminatory termination claim during her deposition. It then concluded that her hostile work environment claim failed as a matter of law

---

[3] We draw no distinction between Smelter's Title VII claims and her corresponding § 1981 claims because they "have the same requirements of proof and utilize the same analytical framework." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1325 n.14 (11th Cir. 2011); *see Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 919 (11th Cir. 2018) ("We examine claims of discrimination and retaliation under the same legal framework regardless of whether the plaintiff invokes section 1981 or section 2000e.").

11

because she lacked evidence that (1) her co-workers' harassment was severe or pervasive and (2) her supervisors knew or should have known of the harassment. Finally, the district court rejected Smelter's retaliation claim because, even though she established a prima facie case, she failed to provide sufficient evidence of pretext. Smelter now challenges each of these rulings.

## II.    STANDARD OF REVIEW

We review *de novo* the district court's grant of summary judgment, construing the facts and drawing all reasonable inferences in favor of the nonmoving party. *Jones*, 683 F.3d at 1291-92. Summary judgment is appropriate if the record gives rise to "no genuine dispute as to any material fact," such that "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## III.    DISCUSSION

Smelter contends that Southern Home (1) discriminated against her by permitting a hostile work environment to exist at the Perry office, (2) discriminated against her by terminating her because of her race, and (3) retaliated against her for reporting her co-workers' racist comments. We consider whether the district court erred in granting summary judgment for Southern Home on each of these claims.

12

**A.    Hostile Work Environment Claim**

We first consider whether the district court erred in granting summary judgment for Southern Home on Smelter's hostile work environment claim.  Title VII makes it unlawful for an employer "to discriminate against any individual with respect to [her] . . . terms, conditions, or privileges of employment, because of [her] race . . . ."  42 U.S.C. § 2000e-2(a)(1).  The Supreme Court has observed that this language "evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women in employment . . . includ[ing] requiring people to work in a discriminatorily hostile or abusive environment."  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotation marks omitted).

To prove a hostile work environment claim, an employee must show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Id.* (citation and internal quotation marks omitted).  When the employee's harassment claim is based on her race, she must prove five elements:  (1) she belongs to a protected class, (2) she was subjected to unwelcome harassment, (3) the harassment was based on her race, (4) the harassment was sufficiently severe or pervasive to alter the terms of her employment and create a discriminatorily abusive working environment, and (5) the employer is responsible for the environment under a

13

theory of vicarious or direct liability. *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002). The district court concluded that Smelter failed to establish the fourth and fifth of these elements. We therefore discuss in turn whether a reasonable jury could conclude that the harassment Smelter suffered was severe or pervasive and whether Southern Home was responsible for that harassment.

### 1. Smelter Offered Sufficient Evidence to Create a Genuine Issue of Material Fact that the Harassment Was Severe or Pervasive.

To establish that harassment was sufficiently severe or pervasive to alter the terms or conditions of her employment, an employee must prove that her work environment was both subjectively and objectively hostile. *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999) (en banc). In other words, the employee must first establish that she "subjectively perceive[d] the environment to be abusive." *Harris*, 510 U.S. at 21. Then she also must satisfy the objective component by showing that her work environment was one "that a reasonable person would find hostile or abusive." *Id.*

We begin with Smelter's subjective perception of her work environment. Smelter repeatedly testified that enduring her co-workers' racist comments was stressful and hurtful. She also explained that it felt like the harassment "never stopp[ed]," as though her co-workers were pushing her to "see how much she [could] take" in the hopes that she would "just quit and leave." Doc. 27 at 176.

14

Southern Home argues that, despite this testimony, Smelter could not have perceived her work environment as hostile because she failed to report her co-workers' racist comments to her supervisors. Our precedent recognizes, however, that an employee's failure to report harassment is not dispositive of whether the employee perceived the environment created by the harassment as hostile or abusive. *See Miller*, 277 F.3d at 1277. Given Smelter's testimony about the impact that the harassment had on her, a reasonable jury could conclude that she subjectively perceived her co-workers' conduct as hostile and abusive.

Turning to the objective inquiry, we consider four factors when evaluating whether harassment was objectively hostile: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Mendoza*, 195 F.3d at 1246. Although these factors help guide the inquiry, "the objective element is not subject to mathematical precision." *Bryant v. Jones*, 575 F.3d 1281, 1297 (11th Cir. 2009). We must view the evidence "cumulatively and in the totality of the circumstances." *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 808 (11th Cir. 2010). When we do so here, we conclude that a reasonable jury could find the harassment objectively hostile.

15

Beginning with the first factor, Smelter provided ample evidence that the racial harassment was frequent; she testified that she heard racist comments "every day" during her employment with Southern Home. Doc. 27 at 40, 181, 186. And even though Smelter's employment lasted only two months, she gave approximately eight examples of racist remarks that she overheard or that were directed at her. *See id.* at 190, 193, 296-97. Even if these eight examples were the only racist remarks made in Smelter's presence during her two months of employment, this Court has held that harassment was pervasive when it occurred at a similar frequency. *See Johnson v. Booker T. Washington Broad. Serv., Inc.*, 234 F.3d 501, 509 (11th Cir. 2000) (holding that "roughly fifteen separate instances of harassment over the course of four months" was pervasive).

As to the second factor, a reasonable jury could conclude that the harassment was severe. Most severe of all and addressed directly to Smelter herself was Smallwood's calling her a "dumb black nigger." Doc. 27 at 249. Implicitly acknowledging the egregiousness of this epithet, Southern Home argues that Smallwood's "one-time use" of it was insufficient to establish severity as a matter of law. Appellee's Br. at 25. We strongly disagree. This Court has observed that the use of this word is particularly egregious when directed toward a person in an offensive or humiliating manner. *See Adams v. Austal, U.S.A., L.L.C.*, 754 F.3d 1240, 1251-57 (11th Cir. 2014) (distinguishing between employees who merely

16

overheard the word and employees at whom it was directed).  Here, Smallwood did not simply use the epithet in Smelter's presence; instead, she directed it at Smelter as a means of insulting her in the midst of an argument.  What is more, Smallwood's use of this word was not an isolated instance—it came at the end of two months during which Smelter had endured racist comments on a daily basis.

The other comments Smelter endured in the office involved obvious racial slurs conveying highly offensive derogatory stereotypes of black people.  For example, Smallwood told Smelter that her straightened hair made her resemble a "mixed monkey" from the movie *Planet of the Apes*.  Doc. 27 at 296; *see also id.* at 280.  She said that President Barack Obama's "big ears" made him "look[] like a monkey."  *Id.* at 190.  Smallwood also said that black men are "lazy" and "the scum of the earth" and that "black women[] ha[d] babies on welfare."  *Id.*  In addition, Smallwood remarked that she was unaware "they buried black people[] on Sunday[s]."  *Id.* at 297.  Raleigh made at least one offensive remark, too, commenting that a group of black people she saw getting off of a bus looked like they were "chained together" and that she "wish[ed] she c[ould] send them . . . back . . . to Africa."  *Id.* at 193.  Comments like these are sufficiently severe to create a hostile work environment.  *See Adams*, 754 F.3d at 1253 (holding that the use of racial slurs around the plaintiff raised a genuine dispute of material fact as to severity); *see also Jones*, 683 F.3d at 1297 ("The use of the term 'monkey' and

17

other similar words have been part of actionable racial harassment claims across the country." (internal quotation marks omitted)).

Southern Home argues that, despite the evidence regarding the frequency and severity of the harassment, Smelter cannot establish the objective component of her claim because she provided no evidence of the third and fourth factors—that the harassment was physically threatening or that it unreasonably interfered with her job performance.  Again, we disagree.  The third factor is established by conduct that is "physically threatening *or* humiliating."  *Mendoza*, 195 F.3d at 1246 (emphasis added).  The only evidence of physically threatening conduct was Smelter's testimony that Smallwood stood up during their altercation and "hit the desk" like she was about "to charge at" Smelter.  Doc. 27 at 249.  But Smelter also presented ample evidence of humiliating conduct. Smelter testified that racial slurs were directed at her every day.  It was surely humiliating for Smelter, a black woman, to hear a co-worker say that black people are "the scum of the earth," *id.* at 190, that Smelter looked like a "mixed monkey," *id.* at 296, and that black people should be "sen[t] [] back . . . to Africa," *id.* at 193.  And Smelter contends that Smallwood, who hit the desk like she was about to charge at Smelter, also called Smelter a "dumb black nigger."  *Id.* at 249.  Smelter provided substantial evidence of humiliating conduct that satisfies the third factor.

True, Smelter's evidence as to the fourth factor was weak. Smelter offered little evidence supporting the fourth factor. But the Supreme Court has made clear that "no single factor is required" to establish the objective component. *Harris*, 510 U.S. at 23. Indeed, "[t]he Supreme Court has cautioned that harassment need not be . . . so extreme that it produces tangible effects on job performance in order to be actionable." *Miller*, 277 F.3d at 1277. Thus, Smelter's claim does not fail simply because she provided little or no evidence the impact of the harassment on her job performance. Considering the totality of the circumstances, particularly the daily frequency and extreme severity of the harassment, including racist remarks made directly to Smelter about her, we conclude that she provided sufficient evidence for a reasonable jury to find that the harassment was objectively severe or pervasive.

**2.  Smelter Offered Sufficient Evidence to Create a Genuine Issue of Material Fact that Southern Home Had Actual Notice of the Hostile Work Environment.**

To survive summary judgment, Smelter also must provide evidence from which a reasonable jury could conclude that Southern Home was liable for the harassment she suffered. "Where the perpetrator of the harassment is merely a co-employee of the victim, the employer will be held directly liable if it knew or should have known of the harassing conduct but failed to take prompt remedial action." *Id.* at 1278. Put another way, an employer's direct liability can be

19

established through evidence of two types of notice: actual and constructive. "Actual notice is established by proof that management knew of the harassment, whereas constructive notice will be found where the harassment was so severe and pervasive that management should have known of it." *Id.*

The district court concluded that Smelter failed to establish Southern Home's notice of the racial harassment in the Perry office because it was undisputed that she failed to report the harassment until the final day of her employment. It is true that Smelter conceded during her deposition that she did not speak about the racist comments with anyone at Southern Home until she reported them to Talton on the day she was terminated. But despite that concession, the record contains a genuine dispute of material fact as to whether Talton—and therefore Southern Home—had actual notice of Smallwood's and Raleigh's racist comments.

Smelter's testimony would enable a reasonable jury to conclude that Talton overheard at least some of the racist comments. First, she testified that "[t]he racial slurs" were "funny to everybody that worked in the Perry office . . . even Brandi Talton." Doc. 27 at 34. Second, she testified that Talton thought it was funny "[w]hen people [were] talking about blacks and considering people as being monkeys and considering people as being apes." *Id.* at 40. Of course, Talton could not have found the racist remarks humorous if she had not overheard them.

20

The record thus contains evidence that Talton had actual notice of the hostile work environment despite Smelter's failure to report it. And because Talton was Smelter's supervisor, we can impute Talton's notice to Southern Home. *See Miller*, 277 F.3d at 1278.

Southern Home fails to grapple with Smelter's testimony that Talton thought the racist comments were funny. Instead, it relies on a different portion of Smelter's testimony, later in her deposition, when she was asked whether she could name "anybody else that can testify that they heard [Smallwood] or [Raleigh] make any race-related remarks," and she responded "[n]ot to my knowledge." Doc. 27 at 194. Southern Home's reliance on this testimony as evidence that it lacked notice is misplaced for two reasons. First, Smelter's testimony that she was not aware of "anybody else" who heard the racist comments is not evidence that Talton did not hear them because Smelter had *already* testified that Talton thought the comments were funny. Second, we must of course construe the facts and draw all reasonable inferences in Smelter's favor. *Jones*, 683 F.3d at 1291-92. To the extent Smelter arguably, but not necessarily, testified inconsistently, we must accept the testimony that is most favorable to her. *See Allen v. Bd. of Pub. Educ. for Bibb Cty.*, 495 F.3d 1306, 1315 (11th Cir. 2007) (observing that we must view all evidence in favor of the non-moving party even if that party provides "vague and contradictory" testimony).

21

In light of Smelter's testimony that Talton found Smallwood's and Raleigh's racist comments humorous, a reasonable jury could conclude that Southern Home had actual notice of Smelter's harassment.  Because a reasonable jury could conclude that Southern Home had actual notice, we do not address whether a reasonable jury could also conclude that Southern Home had constructive notice. *See Breda v. Wolf Camera & Video*, 222 F.3d 886, 890 n.5 (11th Cir. 2000).  The district court erred, therefore, in granting summary judgment for Southern Home on Smelter's hostile work environment claim.

## B.    Discriminatory Termination Claim

We next consider whether the district court erred in granting summary judgment for Southern Home on Smelter's discriminatory termination claim.  In addition to prohibiting employers from permitting a racially hostile work environment, Title VII also makes it unlawful for employers "to discharge any individual . . . because of such individual's race . . . ."  42 U.S.C. § 2000e-2(a)(1).  When, as here, a plaintiff relies upon circumstantial evidence to support her discrimination claim, we analyze it according to the familiar burden shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004).

Under the first step of this framework, the employee must establish a prima facie case of discrimination by showing that:  (1) she belongs to a protected class,

22

(2) she was subjected to an adverse employment action, (3) her employer treated similarly situated employees outside her classification more favorably, and (4) she was qualified to do the job. *Id.* at 1091. Establishing a prima facie case gives rise to a presumption that the adverse action was discriminatory. *Id.* at 1087. The burden then shifts to the employer to rebut the presumption by articulating a legitimate, nondiscriminatory reason for its actions. *Id.* If the employer carries its burden, the presumption raised by the prima facie case is rebutted and the burden shifts back to the employee to show that the "the alleged reason . . . is a pretext for illegal discrimination." *Id.*[4]

The district court granted summary judgment for Southern Home without deciding whether Smelter had established a prima facie case of discriminatory termination. Its analysis stopped short of the *McDonnell Douglas* framework because it concluded that Smelter had unequivocally conceded during her deposition that she was not terminated because of her race. Unlike the district court, we do not think Smelter's testimony went far enough to warrant the rejection of her claim without consideration of the merits. Nonetheless, we affirm because Smelter failed to establish pretext.

---

[4] We have said that a plaintiff need not establish each of the *McDonnell Douglas* elements to survive summary judgment; instead, she may do so where she presents "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Smith*, 644 F.3d at 1328 (internal quotation marks omitted). Smelter does not rely on a convincing mosaic theory, however, so we need not decide whether she could survive summary judgment based on such a theory.

### 1.    Smelter Did Not Waive Her Discriminatory Termination Claim.

The district court's grant of summary judgment for Southern Home rested on Smelter's response to a single question during her deposition.  Smelter testified: "Did I think that Brandi [Talton] was being racial profile—racial when she fired me, that's what you're asking me? . . . No."  Doc. 27 at 246.  The district court concluded that Smelter had waived her discriminatory termination claim through this testimony because she conceded that her termination was not racially motivated.  We disagree for two reasons.

First, Smelter's testimony was narrow:  it pertained only to her view of *Talton's* motivations.  But Talton was not the person who decided to fire Smelter.  Talton was tasked with informing Smelter that she was fired after the decision had already been made; it was McDougal who decided to terminate Smelter's employment.  The viability of Smelter's discrimination claim thus turns on her proof regarding McDougal's motivations, not Talton's.  The portion of Smelter's testimony on which the district court relied is beside the point because it does not speak to McDougal's motivations.  Smelter could not have waived her discrimination claim through that testimony.

Second, even if Talton's motivations were relevant to whether Smelter was terminated due to discrimination, the district court relied solely upon distinguishable authority in concluding that Smelter's testimony was unambiguous

24

enough to waive her claim.  The court concluded that Smelter's testimony amounted to a concession fatal to her claim under our decision in *Ross v. Jefferson County Department of Health*, 701 F.3d 655 (11th Cir. 2012).  Like the case before us, *Ross* involved a claim for race discrimination against the plaintiff's former employer.  *Id.* at 657.  The plaintiff was asked during her deposition whether she "felt like her termination had anything to do with . . . her race," and she responded, "no."  *Id.* at 661 (alterations adopted).  The *Ross* panel held that the plaintiff had waived her claim of discrimination as a result of this "unequivocal concession." *Id.*

Smelter's testimony is distinguishable from the testimony under scrutiny in *Ross*.  The plaintiff in *Ross* "unequivocal[ly] conce[ded]" the ultimate issue regarding her discrimination claim because she testified that her termination did not have "*anything to do with*" her race.  *Id.* at 661 (alteration adopted) (emphasis added).  Smelter, by contrast, testified in narrower terms that Talton was not "being racial" when telling Smelter that she was fired.  Doc. 27 at 246.  Put another way, the plaintiff's testimony in *Ross* foreclosed any possibility that her termination was motivated by her race; Smelter's testimony did not.  Smelter could have meant that Talton was not "being racial" in the sense that she was not motivated by personal racism when she fired Smelter, even if the reason McDougal decided to fire Smelter was impermissibly based on Smelter's race.  The plaintiff's

25

testimony in *Ross*, by contrast, was too broad to draw such a distinction between personal racism and some other race-based motivation.

Testimony like Smelter's cannot constitute waiver of a discriminatory termination claim because, under our precedent, race-based termination is always actionable, even if motivated by factors other than the supervisor's personal racism. *See Smith*, 644 F.3d at 1345. In *Smith*, a white employee sued his former employer for race discrimination after he was punished more severely than his black co-workers for identical conduct. *Id.* at 1324. We held that the employer was not entitled to summary judgment because a jury reasonably could have inferred that the decisionmaker was motivated not by personal racism, but by a desire to avoid the increased economic and public pressures associated with failing to discipline a white worker for racially insensitive conduct—a race-based reason. *Id.* at 1344-45. Applying the reasoning in *Smith* to this case, Smelter could establish that she was terminated because of discrimination even if she conceded that she was not fired as a result of personal racism.[5] Because Smelter did not "unequivocal[ly] conce[de]" that her race played no role in the decision to fire her,

---

[5] In addition to relying on Smelter's testimony that she did not believe Talton was "being racial," Southern Home identifies three other portions of Smelter's testimony where she stated that neither Talton nor McDougal "expressed racism," "was a racist," or "act[ed] racist." Doc. 27 at 214, 237, 274. This testimony, which only addresses the supervisors' lack of personal racism, does not amount to waiver of Smelter's discriminatory termination claim for the same reason.

the district court erred in concluding that Smelter waived her discriminatory termination claim. *Ross*, 701 F.3d at 661.[6]

### 2.    Smelter Failed to Establish Pretext.

Although the district court did not reach the merits of Smelter's discriminatory termination claim, we "may affirm the judgment of the district court on any ground supported by the record, regardless of whether that ground was relied upon or even considered by the district court." *Kernel Records Oy v. Mosley*, 694 F.3d 1294, 1309 (11th Cir. 2012). Even assuming that Smelter established a prima facie case of discrimination, we conclude that her discriminatory termination claim fails as a matter of law for lack of evidence of pretext.

Southern Home has articulated several legitimate, nondiscriminatory reasons for terminating Smelter: (1) she was a substandard employee who required remedial training and had difficulty coordinating with caregivers, which was her primary job responsibility, (2) she accused her coworkers of stealing and lying, and (3) she was involved in the altercation with Smallwood. Southern Home having articulated these reasons, the burden shifts to Smelter to show that they were

---

[6] Southern Home argues that Smelter waived the argument that her testimony was not an unequivocal concession of the lack of racial discrimination because she failed to raise that argument in the district court. But in her response to Southern Home's motion for summary judgment, Smelter argued that Southern Home "mischaracterize[ed]" her testimony as a concession. Doc. 24 at 12. This was sufficient to preserve her argument for appeal.

pretextual.  She can carry her burden by "cast[ing] doubt on [Southern Home's] proffered nondiscriminatory reasons sufficient to allow a reasonable factfinder to determine that [they] were not what actually motivated [Southern Home's] conduct."  *Silvera v. Orange Cty. Sch. Bd.*, 244 F.3d 1253, 1258 (11th Cir. 2001) (internal quotation marks omitted).  We reject Smelter's argument that she has presented evidence sufficient to undermine all three of Southern Home's purported nondiscriminatory reasons.  We conclude that she has failed to cast sufficient doubt on Southern Home's first reason—that she was a substandard employee who was still in her probationary period.  Because a plaintiff's failure to rebut even one nondiscriminatory reason is sufficient to warrant summary judgment for the employer, we need not address Smelter's remaining pretext arguments.  *See Crawford v. City of Fairburn*, 482 F.3d 1305, 1308 (11th Cir. 2007) ("If the employer proffers more than one legitimate, nondiscriminatory reason, the plaintiff must rebut each of the reasons to survive a motion for summary judgment.").

Regarding Southern Home's first purported nondiscriminatory reason for terminating Smelter, that she was a substandard employee who required remedial training and had difficulty coordinating with caregivers, Smelter does not dispute that she had some difficulties with her job duties.  She concedes, for example, that

28

Southern Home had to provide her with extra training on linking.[7]  Instead of

disputing the quality of her performance, Smelter defends it by arguing that any

shortcomings were the company's fault, not hers.  Specifically, she argues that her

performance difficulties were due to her lack of training and to understaffing at the

Perry office, both of which were beyond her control.

Smelter testified that she felt unprepared when she arrived at the Perry office

because, unlike the other Customer Service Supervisors, she received "no training

in Macon at all."  Doc. 27 at 155.  And it is undisputed that the Perry office would

have benefited from an extra Customer Service Supervisor given the high

workload.  But even assuming, as we must, that Smelter received less initial

training than her co-workers and that the Perry office was understaffed, Smelter

cannot rely on these facts to establish pretext because she points to no evidence

that her supervisors intentionally denied her training or knowingly understaffed the

office so that she would fail at her job duties.  On the contrary, the evidence shows

---

[7] Despite this concession, Smelter argues that she had no more trouble with linking than any of the other Customer Service Supervisors.  As evidence, she cites linking reports showing linking "percentages" for each of the Customer Services Supervisors.  But these reports are not probative of pretext for two reasons.  First, it is undisputed that Raleigh helped Smelter with her linking, which would have artificially improved her linking percentages.  Second, and more importantly, McDougal testified that neither she nor the branch managers consulted the linking reports, which is significant because it is the employer's perceptions about the employee's job performance—even if mistaken—that matters when analyzing pretext.  *See Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010) ("The inquiry into pretext centers on the employer's beliefs . . . not on reality as it exists outside of the decision maker's head.").  Thus, Smelter cannot rely on the linking reports to refute that she was terminated for performing poorly.

that Talton went to great lengths to provide Smelter with the resources she needed to succeed. Talton asked Hortman to travel to the Perry office to provide Smelter with supplemental training—which she had never done for any other Customer Service Supervisor—and asked Raleigh to answer Smelter's questions and help her with her linking. The fact that Smelter continued to struggle with her job duties, then, was not the result of a lack of support on Southern Home's part. Had Smelter provided evidence that Southern Home intentionally undermined her ability to perform, then her lack of initial training and the understaffing in the Perry office might help her establish pretext. But because the record contains no such evidence, Smelter's first pretext argument fails.

Smelter's second pretext argument is that she was disciplined more severely than her white co-workers who experienced similar performance problems. One way for a plaintiff to establish pretext is through the use of comparator evidence, which involves showing that the plaintiff's "employer treated similarly situated employees outside [her] classification more favorably than herself." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997). "To make a comparison of the plaintiff's treatment to that of non-minority employees, the plaintiff must show that [she] and the employees are similarly situated in all relevant respects." *Id.*

Before evaluating Smelter's comparator evidence, we pause to note the apparent tension in our precedent regarding the standard for identifying a valid

30

comparator. In some cases, we have said that the plaintiff's misconduct and the comparator's misconduct must be "nearly identical." *Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1185 (11th Cir. 1984); *Wilson*, 376 F.3d at 1091. In other cases, we have said that a comparator is similarly situated to the plaintiff if she and the comparator were accused of "the same or similar conduct." *Holifield*, 115 F.3d at 1562; *Anderson v. WBMG-42*, 253 F.3d 561, 564 (11th Cir. 2001). To the extent these standards conflict, we conclude that the conflict makes no difference in this case; Smelter's comparator evidence fails regardless of whether we apply the "same or similar" standard or the "nearly identical" standard.

Smelter has identified three white employees as potential comparators: Lind, Valasky, and Smallwood. Because there were significant differences in those employees' circumstances, however, we reject her argument that all three were similarly situated to her because they had similar performance problems yet escaped termination.

We begin with Lind and Valasky, both of whom had documented performance problems. Lind received "multiple complaints regarding her lack of customer service towards clients and referral case managers." Doc. 35 at 106. Valasky, who replaced Smelter, received a "[c]ounseling statement" for "[f]ailure to enforce Telephony." *Id.* at 102-03. But unlike Smelter, Lind and Valasky were never accused of instigating an altercation with a co-worker. Again, comparators

31

must be similarly situated to the plaintiff "in all relevant respects." *Holifield*, 115 F.3d at 1562. Even if Smelter's performance problems were similar to Lind's and Valasky's, the fact that Smelter had engaged in additional misconduct—her altercation with Smallwood—means that she was not similarly situated to those employees and cannot rely on them as comparators.

Smelter also was not similarly situated to Smallwood. Smallwood received three warnings for failure to perform her job duties. And, of course, she was involved in the altercation with Smelter. At first blush, these facts make Smallwood appear to be similarly situated to Smelter. But there were two important differences between Smelter and Smallwood. First, Smelter was a new employee who was still well within her six month probationary period; Smallwood, in contrast, had worked for Southern Home for over two years. Second, McDougal—the decisionmaker—believed that Smelter had instigated the altercation with Smallwood and that Smallwood was a mere participant. Smelter argues that McDougal's belief was mistaken, but pretext turns on whether the employer was dissatisfied with the employee for non-discriminatory reasons, "even if mistakenly or unfairly so." *Alvarez*, 610 F.3d at 1266. Because McDougal's beliefs—whether correct or not—are the focus of the pretext analysis, and because Smelter failed to provide any evidence contradicting McDougal's testimony that

32

she believed Smelter had instigated the altercation, Smelter cannot rely on

Smallwood as a comparator.

Aside from her comparator evidence and her argument that Southern Home

was to blame for her performance problems, Smelter offers nothing that casts any

doubt on Southern Home's explanation that her problems performing her duties

were the true reason behind her termination.[8]  She has failed, therefore, to establish

that Southern Home's nondiscriminatory reason for firing her is unworthy of

belief.  As a result, Southern Home was entitled to summary judgment on

Smelter's discriminatory termination claim.

## C.    Retaliation Claim

Smelter's final argument is that the district court erred in granting summary

judgment for Southern Home on her retaliation claim.  In addition to prohibiting

discrimination, Title VII also prohibits retaliation by making it unlawful "for an

employer to discriminate against any of his employees . . . because [the employee]

has opposed any practice made an unlawful employment practice by this

_____

[8] Smelter also argues that an investigative summary created by Southern Home in response to her charge of discrimination shows pretext because it indicates that Southern Home was willing to fabricate evidence to defend itself against her claims.  The summary contains purported statements by Perry office employees about Smelter and the events leading up to her termination.  According to Smelter, some of the statements in the summary that are favorable to Southern Home are inconsistent with what the Perry office employees told Southern Home's investigator.  But none of the purported misstatements relates to Smelter's job performance.  Given the ample amount of evidence—including her own admissions—that Smelter struggled with her job responsibilities, we conclude that Smelter's argument regarding the summary fails to cast doubt on the legitimacy of Southern Home's assertion that it terminated Smelter because of her poor job performance.

subchapter."  42 U.S.C. § 2000e-3(a).  As with Title VII discrimination claims, we analyze retaliation claims that are based on circumstantial evidence according to the *McDonnell Douglas* burden shifting framework.  *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1181 (11th Cir. 2010).  The first step in this framework is for the employee to establish a prima facie case of retaliation.  If she does so, the burden shifts to the employer to produce evidence that its action was taken for a legitimate, nondiscriminatory reason.  *Id.*  If the employer carries this burden, the burden shifts back to the employee to show that the "proffered reason was merely a pretext to mask discriminatory actions."  *Id.* at 1181-82 (internal quotation marks omitted).

The district court concluded that Smelter had established a prima facie case of retaliation but nonetheless dismissed her claim because she failed to establish pretext.  On appeal, Southern Home defends the district court's conclusion regarding pretext, but it also argues that Smelter failed to prove a prima facie case because she lacked evidence that her protected activity caused her termination.  We need not analyze Southern Home's arguments regarding Smelter's prima facie case, however, because we agree with the district court that Smelter failed to establish pretext.  As we explained in our discussion of Smelter's discriminatory termination claim, Smelter failed to raise a genuine dispute of material fact as to whether each of the legitimate, nondiscriminatory reasons that Southern Home

34

articulated for terminating her was pretextual.  On this record, that conclusion applies with equal force to Smelter's retaliation claim.  We therefore affirm the district court's grant of summary judgment in favor of Southern Home on this claim.

## IV.    CONCLUSION

For the foregoing reasons, we affirm in part and reverse in part.  We affirm the district court's grant of summary judgment for Southern Home on Smelter's discriminatory termination and retaliation claims.  But we reverse the district court's ruling on Smelter's hostile work environment claim and remand that claim to the district court for further proceedings.

**AFFIRMED IN PART, REVERSED IN PART, and REMANDED.**