[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 20-13581

_____

THOMAS E. REYNOLDS,
As Trustee,

Plaintiff-Appellant,

versus

MINTZ, LEVIN, COHN, FERRIS, GLOVSKY AND POPEO,
P.C.,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama
D.C. Docket No. 2:18-cv-01453-ACA

_____

Before JILL PRYOR, LUCK, and BRASHER, Circuit Judges.

PER CURIAM:

Thomas Reynolds, the bankruptcy trustee for Atherotech, Inc., and Atherotech Holdings, Inc. (collectively, "Atherotech"), filed this lawsuit against Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C. ("Mintz Levin"), a law firm that previously represented Atherotech. Mintz Levin provided legal advice to Atherotech related to the company's practice of paying processing and handling fees ("P&H fees") to physicians who, after drawing blood from patients, prepared the specimens for testing and shipped them to Atherotech's laboratory for analysis. Reynolds alleged that Mintz Levin was negligent because it failed to direct the company to stop paying P&H fees. The district court granted summary judgment to Mintz Levin, ruling that the law firm had no duty to provide such advice and thus had not breached the standard of care. After careful consideration and with the benefit of argument, we affirm the district court's judgment.

## I.    FACTUAL BACKGROUND[1]

---

[1] Because we write only for the parties, we assume their familiarity with the facts. We do not restate the facts, except as necessary to explain our decision.

Atherotech operated a clinical laboratory where it analyzed blood specimens to determine patients' cholesterol levels. When a physician ordered an Atherotech blood test for a patient, blood would need to be drawn from the patient. The blood specimen would then need to be processed and shipped to Atherotech for testing. Atherotech generally relied on physicians' offices to draw blood from patients, prepare the specimens for testing, and ship them to Atherotech's laboratory. During the relevant time frame, Atherotech paid physicians a three-dollar fee for drawing a patient's blood and a seven-dollar fee for processing and handling the specimen.

In 2011, Atherotech retained Mintz Levin to provide legal and regulatory advice. One of the issues on which Atherotech sought advice was the payment of P&H fees. Atherotech had learned that a competitor was paying physicians higher P&H fees of at least $20 per specimen. Atherotech believed that it was losing business to this competitor and that the competitor's conduct was illegal. It asked Mintz Levin partner Hope Foster for advice about how to address the situation.

Foster provided legal advice to the company's board about the practice of paying physicians P&H fees. She warned the board of the legal risks associated with paying any P&H fees, telling the board that "[p]ayment to physicians of amounts associated with specimen handling . . . is a growing issue," and as to the legality of

such payments, "[t]he picture is murky." Doc. 41-24 at 5.[2] Concerning the competitor's higher payments, Foster suggested several options, including: reporting the competitor to federal or state authorities, filing a whistleblower case, or seeking an advisory opinion from the Office of Inspector General for the Department of Health and Human Services ("OIG"). Foster reviewed each option with the board, describing its pros and cons. She warned the board that reporting the competitor's conduct to the government was risky because Atherotech was itself paying P&H fees, albeit it at a lower rate. Ultimately, Atherotech made a business decision to report the competitor to the Department of Justice ("DOJ").

Around this time, relators filed sealed *qui tam* actions against other laboratory companies relating to their P&H fee arrangements. The next year, a relator filed a sealed *qui tam* action against Atherotech based on its payment of P&H fees to physicians.

The DOJ later opened an investigation into clinical laboratories' practice of paying physicians P&H fees. The government requested information from Atherotech and other laboratories about their practices.[3] Atherotech, which retained Mintz Levin for

---

[2] "Doc." numbers refer to the district court's docket entries.

[3] The record does not reveal whether the government opened this investigation in response to complaints from Atherotech and other laboratories about

the investigation, agreed to cooperate with the government. While the investigation was ongoing, Atherotech continued to pay P&H fees.

In March 2014, the government notified Atherotech that it was a target of the investigation. The government alleged that Atherotech had violated the law by paying P&H fees because it "essentially [was] sharing a portion of the clinical laboratory fee, providing an incentive for the referring physician to order more tests[,] and increasing the risk of overutilization." Doc. 41-37 at 2. Shortly afterward, the OIG issued a special fraud alert regarding laboratories' practice of paying physicians P&H fees. The alert warned that it was a violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, for laboratories to pay a physician a P&H fee when "one purpose of the payment [was] to induce or reward referrals of Federal health care program business," even if the payment amount was at "fair market value." Doc. 41-39 at 5. After the OIG issued the alert, Atherotech stopped paying P&H fees.

About two years later, Atherotech filed for Chapter 7 bankruptcy. The bankruptcy court appointed Reynolds as trustee of the bankruptcy estate. He sued Mintz Levin, alleging that the law firm had been negligent in failing to "advise[] Atherotech to stop

---

their competitor's practices, as a result of the pending *qui tam* actions, or for other reasons.

paying P&H fees."[4] Doc. 22 at 11. Mintz Levin moved for summary judgment. The district court granted the motion, concluding there was no genuine issue of material fact "about whether Mintz Levin's legal advice was unreasonable." Doc. 49 at 2.

This is the trustee's appeal.

## II.   STANDARD OF REVIEW

"We review *de novo* the district court's grant of summary judgment, construing the facts and drawing all reasonable inferences in favor of the nonmoving party." *Smelter v. S. Home Care Servs., Inc.*, 904 F.3d 1276, 1284 (11th Cir. 2018). Summary judgment is appropriate if the record gives rise to "no genuine dispute as to any material fact," such that "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## III.   LEGAL ANALYSIS

---

[4] In the complaint, the trustee also alleged that Mintz Levin was liable for breach of contract and unjust enrichment and objected to a claim that Mintz Levin had filed in the bankruptcy proceeding for unpaid legal fees. On appeal, the trustee acknowledges that all of his claims turn on whether Mintz Levin committed legal malpractice by breaching the applicable standard of care. We thus concentrate our analysis on the trustee's legal malpractice claim.

Under Alabama common law,[5] a plaintiff bringing a legal malpractice claim must establish "the same elements that must be proven in an ordinary negligence suit." *Indep. Stave Co. v. Bell, Richardson & Sparkman, P.A.*, 678 So. 2d 770, 772 (Ala. 1996). The elements of a legal malpractice action are "basically" the same as the elements for an ordinary negligence claim: "the plaintiff must prove a duty, a breach of the duty, that the breach was the proximate cause of the injury, and damages." *Moseley v. Lewis & Brackin*, 533 So. 2d 513, 515 (Ala. 1988).

The existence of a duty of care is "[f]undamental to the maintenance of a negligence action." *Pugh v. Butler Tel. Co.*, 512 So. 2d 1317, 1319 (Ala. 1987). "In Alabama, the existence of a duty is a strictly legal question to be determined by the court." *Taylor v. Smith*, 892 So. 2d 887, 891 (Ala. 2004). This appeal turns on the legal question of whether Mintz Levin had a duty to direct Atherotech to stop paying P&H fees.[6] Because Mintz Levin owed no

---

[5] Both the trustee and the law firm maintain that Alabama common law governs the trustee's legal malpractice claim. For the reasons given by the district court, we agree.

[6] When the trustee originally filed this lawsuit, he also brought claims against Atherotech's investors, seeking to void dividends paid to the investors as fraudulent transfers, as well as various tort and breach of contract claims against the company's financial advisor. The district court decided *sua sponte* to sever the case into three separate lawsuits: one against Mintz Levin, one against the investors, one against the financial advisor. In his appellate brief, the trustee asserts that the district court "incorrectly" severed the action into three separate cases. Appellant's Br. at 7–8. But the trustee "makes only pass-

such duty, the district court properly granted summary judgment to the law firm.

Under Alabama law, an attorney owes his client a duty to "exercise an ordinary and reasonable level of skill, knowledge, care, attention, and prudence common to members of the legal profession in the community." *Mylar v. Wilkinson*, 435 So. 2d 1237, 1239 (Ala. 1983). In the context of this case, the parties agree that when a client requests legal advice about a practice, the attorney's duty in that context is to carefully examine the practice, assess the risk associated with it, and advise the client of the attorney's judgment so that the client can make an informed decision. *See* Ala. R. Pro. Conduct 1.4(b) (stating that an attorney's duty is to provide a sufficient explanation to allow "the client to make informed decisions").

The trustee concedes that when a client seeks legal advice on an area of law that "is unsettled with respect to the client's particular situation," then "[t]he bar for providing reasonable advice . . . is lowered." Appellant's Br. at 26. Indeed, it is well-established under Alabama law that an "attorney is not answerable for error in judgment upon points of new occurrence, or of nice and doubtful construction." *Herston v. Whitesell*, 348 So. 2d 1054, 1057

---

ing references to" this issue and thus has abandoned any argument challenging the district court's severance order. *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014).

(Ala. 1977). As a result, when an attorney advises a client on an area where the law is "open," the attorney is not negligent simply because it later turns out that the attorney's advice was incomplete or incorrect. *See Buchanan v. Young*, 534 So. 2d 263, 265 (Ala. 1988) (affirming grant of summary judgment to attorney on malpractice claim alleging that attorney was negligent in failing to timely file a notice of appeal because, even though the attorney missed the filing deadline, at the time he acted there was an "absence of authority" on the deadline for the notice of appeal, meaning the law was not "settled").

Viewing the evidence in the light most favorable to the trustee, we nonetheless cannot say that Mintz Levin breached any duty. The evidence in the summary judgment record reflects that Atherotech requested legal advice from Mintz Levin about the payment of P&H fees and what it could do to address a competitor's practice of paying much higher fees. In response to the request, Mintz Levin advised Atherotech so that the company could make informed judgments about its own payment of P&H fees and whether to report its competitor. Regarding the propriety of paying P&H fees, Foster explained to the company's board that "[i]t remain[ed] an open question" whether the company could pay the fees, describing the picture as "murky." Doc. 41-24 at 5. She warned the board that "there was always a risk in making payments to providers and the only way to eliminate such risk would be to stop paying P&H [f]ees." Doc. 41-8 at 5. Addressing the issue of the competitor's higher payments, Foster presented

the board with several options for steps it could take, including reporting the competitor to state or federal officials, bringing a whistleblower case, or petitioning the OIG to issue a special fraud alert about the payments. She reviewed with the board the pros and cons of each approach, including warning the board that reporting the competitor to the government was risky given that Atherotech was itself paying P&H fees. After receiving Foster's advice, the board decided that the company would continue to pay P&H fees and complain to the DOJ about the competitor who was paying higher fees.

Reynolds contends that the standard of care required Mintz Levin to do more when advising the company, arguing that the law firm was obliged to "advise Atherotech that it should stop paying P&H fees." Appellant's Br. at 42. According to the trustee, the law firm had a duty to provide such advice because, at the time Mintz Levin advised Atherotech, the law was settled that it was illegal to pay P&H fees.[7]

We reject the trustee's argument. We cannot say that at the time Mintz Levin advised Atherotech it was "settled law," for purposes of a legal malpractice claim, that laboratories could not legally pay P&H fees when those fees were equal to the fair mar-

---

[7] The trustee also argues that the standard of care required Mintz Levin to quantify the risk associated with continuing to pay P&H fees and to provide its legal advice in writing. We reject those arguments because we agree with the district court's treatment of them in its well-reasoned order.

ket value of the services provided. When Mintz Levin advised Atherotech in 2011, the OIG had not yet issued the 2014 Special Fraud Alert, which directly addressed the payment of P&H fees.[8] It is true that at the time of the advice the OIG had issued some guidance, a 1994 Special Fraud Alert and a 2005 Advisory Opinion. But neither the 1994 Special Fraud Alert nor the 2005 Advisory Opinion directly addressed whether a laboratory was permitted to pay a P&H fee set at fair market value.

With regard to clinical lab services, the 1994 Special Fraud Alert warned only that "[w]henever a laboratory offers or gives to a source of referrals anything of value *not paid for at fair market value*," it gives rise to an "inference . . . that the thing of value is offered to induce the referral of business." Doc. 41-12 at 11 (emphasis added). But the alert stopped short of saying that a laboratory could not give a referral source something of value paid for *at fair market value*; thus, it left open the possibility that a laboratory could pay physicians up to the fair market value for the services of processing and shipping specimens.

The OIG's 2005 Advisory Opinion addressed a different issue—whether a laboratory could pay physicians a fee of up to six dollars for each blood draw. The OIG explained that Medicare already reimbursed physicians three dollars for each blood draw.

---

[8] Because the question is not before us, we do not decide whether the OIG's 2014 Special Fraud Alert settled the question.

The OIG advised that a laboratory paying a physician up to twice Medicare's reimbursement rate would give rise to an inference that the higher fee was being paid to induce the physician to refer patients to the laboratory, which would violate the law. The opinion did not address whether a laboratory was allowed to pay a physician a separate P&H fee set at the fair market value of processing and handling the specimen.

Because at the time of Mintz Levin's advice to Atherotech the law was "unsettled" whether laboratories could pay physicians P&H fees that were equal to fair market value for the physician's services, Mintz Levin had no duty to advise Atherotech to stop paying P&H fees.[9] The law firm's duty with respect to the payment of P&H fees and how to address the competitor's payment of higher P&H fees was to advise Atherotech of the risks of various options and leave to the company the decision of what to

---

[9] The trustee argues that because his expert witness opined the law was settled that laboratories could not pay P&H fees, there was a disputed issue of material fact about whether Mintz Levin owed a duty to advise Atherotech not to pay the fees. The trustee's argument misses the mark for two reasons. First, the trustee's expert did not actually opine that the law regarding P&H fees was settled at the time Mintz Levin advised Atherotech. Rather, the expert opined that Mintz Levin should have anticipated the OIG's 2014 Special Fraud Alert, implicitly conceding that the law was not settled until the alert was issued. Doc. 41-44 at 15. Second, the trustee's argument treats the question of the scope of Mintz Levin's duty as a question of fact, ignoring that under Alabama law questions of duty are "legal question[s] to be determined by the court." *Taylor*, 892 So.2d at 891.

do. Mintz Levin fulfilled that duty. The district court therefore properly granted summary judgment to the law firm on the trustee's claims. *See Buchanan*, 534 So. 2d at 265 (concluding attorney was entitled to summary judgment on malpractice claim when, at the time the attorney provided advice, the relevant legal question was "open"); *Herston*, 348 So. 2d at 1057.

## IV.    CONCLUSION

For the reasons above, we affirm the district court's grant of summary judgment.

**AFFIRMED.**