[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-10875

_____

D.C. Docket No. 2:16-cv-00293-WKW-GMB

SHARRON HERRON-WILLIAMS,

Plaintiff – Appellant,

versus

ALABAMA STATE UNIVERSITY,

Defendant – Appellee.

_____

Appeal from the United States District Court
for the Middle District of Alabama

_____

(February 7, 2020)

Before NEWSOM, TJOFLAT, and GILMAN,[*] Circuit Judges.

PER CURIAM:

_____

[*] Honorable Ronald Lee Gilman, United States Court of Appeals for the Sixth Circuit,
sitting by designation.

Dr. Sharron Herron-Williams brought this Title VII suit against her former employer, Alabama State University ("ASU"), raising both discrimination and retaliation claims, after she was relieved of several administrative appointments at ASU. She claims that she faced discrimination based on her race and gender, and that ASU removed her from her administrative positions and cut her pay after she sent an email to ASU's president complaining about the alleged discriminatory treatment. The District Court granted summary judgment to ASU on each of Dr. Herron-Williams's claims, reasoning that Dr. Herron-Williams failed to make out a prima facie case for race or gender discrimination and for retaliation. We agree and therefore affirm.

## I.

Dr. Herron-Williams, a black female professor of political science, held several positions over the course of her employment at ASU. She first joined the faculty as an associate professor in 2003. She received tenure in 2008 and achieved the rank of full professor in 2009. In 2009, she was appointed ASU's Faculty Athletic Representative ("FAR")[1] by then-President Dr. William Harris, a black male. In 2010, she was named Interim Dean for the College of Liberal Arts

---

[1] The National Collegiate Athletic Association ("NCAA") requires that each school appoint a FAR to serve as a liaison between academics and athletics, ensure compliance with NCAA rules, encourage academic and athletic integrity, and promote the overall student-athlete experience.

and Social Sciences.  She held that temporary position until her contract expired on September 30, 2011.  In January 2011, Dr. Herron-Williams also began serving as Interim Associate Provost for Academic Affairs.  Each of these administrative appointments came with a pay stipend above Dr. Herron-Williams's regular salary as a professor.

In February 2014, Dr. Gwendolyn E. Boyd, a black female, became the President of ASU.  In less than a month she filled several of the interim positions at ASU with permanent employees, including the Interim Associate Provost position that Dr. Herron-Williams held at the time.  Dr. Leon C. Wilson, a black male and ASU's new Provost under President Boyd, sent Dr. Herron-Williams a memo in February 2014 informing her that she would be removed from the Associate Provost position and that she would return to her primary role as a Professor of Political Science.  The memo also explained that, in addition to her professorial responsibilities, she would be "assigned special duties with Academic Affairs" and would "continue the supervision of the Office of Minority and International Affairs."  Because she would retain some administrative duties, her salary was not reduced, and she continued to receive the pay stipend she earned as Interim Associate Provost.

The bulk of Dr. Herron-Williams's claims stem from the alleged discriminatory treatment she experienced as supervisor of the Office of Minority

and International Affairs ("OMIA"). We therefore first discuss the circumstances of Dr. Herron-Williams's supervision of OMIA (and her subsequent removal from OMIA), before turning to her removal as ASU's FAR, the corresponding pay cut, and ultimately the filing of this suit.

A.

Dr. Herron-Williams began supervising OMIA in February 2014, upon the retirement of OMIA's previous supervisor, Dr. Stephen Havron, a white male. As supervisor of OMIA, Dr. Herron-Williams oversaw the processing and submission of forms that ASU's international students were required to submit to the U.S. Department of Homeland Security. According to Dr. Herron-Williams, this required her to be authorized as ASU's principal designated school official ("PDSO") so that she could access the Student and Exchange Visitor Information System to properly process international students' visa-related matters. Dr. Havron had the PDSO designation when he supervised OMIA.

Dr. Herron-Williams requested multiple times that Dr. Boyd designate her as the PDSO. Dr. Boyd never granted Dr. Herron-Williams's requests, and Dr. Herron-Williams never received the PDSO designation.

The parties dispute why Dr. Herron-Williams never received the PDSO designation. Dr. Herron-Williams claims Dr. Boyd and Dr. Wilson refused to give her the PDSO designation for insidious reasons—race and gender discrimination.

4

As evidence of discrimination, she points primarily to ASU's attempt to bring Dr. Havron back to supervise OMIA.  According to Dr. Herron-Williams, although she had never received any complaints about her performance as supervisor of OMIA or been informed of any other reason that would prompt ASU to replace her, Dr. Wilson reached out to Dr. Havron at some point before August 2014 to persuade him to return to ASU to supervise OMIA—in an attempt to, as Dr. Herron-Williams claims, "squeeze her out and replace her with a white male."  Dr. Havron declined Dr. Wilson's offer to return to ASU.

For its part, ASU offers several inconsistent reasons for its failure to grant Dr. Herron-Williams the PDSO designation.  Dr. Boyd, Dr. Wilson, and Dr. Charles Smith—the Interim Vice President for Student Affairs and Dr. Herron-Williams's supervisor—each point fingers at the others.  Dr. Wilson claims that Dr. Boyd did not want to give Dr. Herron-Williams the designation because Dr. Herron-Williams was supervising OMIA only on an interim basis.  Dr. Boyd, on the other hand, claims that it was a matter for Dr. Wilson or Dr. Smith to handle and, regardless, there was already someone in OMIA who had the requisite authority to process the visas and related paperwork.

Dr. Herron-Williams claims that ASU's refusal to grant her the PDSO designation seriously undermined her ability to supervise OMIA.  The parties

5

apparently agree that OMIA was not functioning properly during Dr. Herron-Williams's short tenure as supervisor.

Dr. Herron-Williams also claims that she was thwarted in her role as supervisor of OMIA by ASU's refusal to provide her with adequate equipment, which further hindered OMIA's operation.  Shortly after taking over at OMIA, Dr. Herron-Williams complained that OMIA lacked adequate computer equipment to be able to process the student visas.  She sent multiple emails in May and June of 2014 requesting new computers and a printer, but OMIA never received them.  The equipment in OMIA during Dr. Herron-Williams's tenure as supervisor was apparently the same equipment that ASU provided to OMIA while Dr. Havron was supervisor, with the exception of a printer that Dr. Havron supplied himself, and which he took with him when he retired.

On August 6, 2014, Dr. Herron-Williams sent a lengthy, three-page email to Dr. Boyd complaining about this negative treatment.  She recounted the lack of necessary computer equipment, the failure to authorize her PDSO designation, and the attempt to bring Dr. Havron back to replace her, as well as the posting of the Director of OMIA position on ASU's website without her knowledge, and condemned ASU's treatment of her as highly unprofessional and unethical. Finding their dealings with her inexplicable, she wrote: "In my case, the intolerable actions of Dr. Wilson and a few other administrators can only be based on gender,

6

age, or educational background if not race and ethnicity.  A hostile work environment has been created."

Five weeks after she sent that email, Dr. Herron-Williams was relieved of her duties as supervisor of OMIA.  On September 11, 2014, Dr. Wilson sent Dr. Herron-Williams a memo advising that she was being reassigned to her primary role as a Professor of Political Science, and that she would no longer supervise OMIA.  The memo did not explain why she was removed from OMIA.  Later, in response to Dr. Herron-Williams's first charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") in March 2015, ASU claimed that it removed her from her OMIA position because she "was never able to obtain [the PDSO] classification."

ASU did not appoint a replacement supervisor until December 2015, when Dr. Boyd appointed Carol Williams, a black female, to supervise OMIA on an interim basis.  ASU permanently filled the OMIA position in 2017, when Dr. Wilson—who was now serving as ASU's interim president—appointed Dr. Linwood Whitten, a black male.

## B.

In September 2014, Dr. Boyd also decided not to renew Dr. Herron-Williams's appointment as ASU's FAR.  Dr. Herron-Williams had served as FAR on a yearly basis, under several different ASU presidents, since her appointment in

2009.  When her last FAR contract expired on September 30, 2014, Dr. Boyd declined to renew her appointment.  Dr. Herron-Williams, however, was unaware that her contract had not been renewed until payroll informed her in November 2014 that her contract had expired.

As with the OMIA position, Dr. Boyd did not immediately appoint a replacement FAR.  She initially selected Dr. Janel Bell Haynes, a black female professor, but Dr. Haynes ultimately could not accept the appointment.[2]  Dr. Sara Kiser, a white female professor, reached out to the Athletic Director when she learned that the FAR position was still open.  After meeting with both Dr. Boyd and the Athletic Director, Dr. Kiser was appointed to the FAR position in March 2015.

## C.

On September 10, 2015—over a year after Dr. Herron-Williams was removed from her positions in OMIA and as ASU's FAR, and six months after she filed her first charge of discrimination with the EEOC—Dr. Wilson sent Dr. Herron-Williams a memo indicating that her salary would revert back to that of a professor as of October 1, 2015, since her "interim and supplemental duties have ended."  Dr. Herron-Williams claims that her pay cut was not handled consistent

---

[2] The Athletic Director also identified Dr. T.J. Exford, another black female professor, as a candidate for the FAR position, but she was also unable to accept the appointment, and so Dr. Exford's name was never forwarded to Dr. Boyd for consideration.

with ASU's usual practice, in which ASU allowed professors to continue at their higher administrative salaries even after they no longer held any administrative positions.  Dr. Wilson acknowledges that it is his usual practice to continue an administrator's higher salary after he or she has been reassigned to a non-administrative position to give that person some time to adjust before being placed back on his or her original, lower salary.  According to Dr. Wilson, he usually assigns the former administrator additional duties to justify the continuation of the stipend.

In Dr. Herron-Williams's case, Dr. Wilson claims that he used his discretion to reassign Dr. Herron-Williams to OMIA in February 2014 and to extend the administrative pay that she received as Interim Associate Provost through the 2014–2015 academic year "because the funds were present in that fiscal year," but that he "could not justify" continuing past that.  Dr. Herron-Williams claims that the pay cut was an extension of the discrimination that resulted in her termination from OMIA and thus the end of her supplemental duties, and that it amounted to retaliation for her August 6, 2014, email and her filing of discrimination charges with the EEOC in March 2015.

## D.

Dr. Herron-Williams brought this suit under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et. seq.*, alleging in a six-count complaint that ASU's

9

actions amounted to unlawful race and gender discrimination and unlawful retaliation for protesting that discrimination.[3]  First, she claimed that ASU discriminated against her based on her race and gender when it terminated her from her positions as supervisor of OMIA (Count II) and as ASU's FAR (Count IV),[4] and when it reduced her salary (Count VI).  Second, she claimed that ASU took each of these actions in retaliation for her August 6, 2014, email (Counts I, III, and V, respectively) and her subsequent filing of EEOC charges (Count V).

ASU moved for summary judgment on each of Dr. Herron-Williams's claims, which the District Court granted.  The District Court first held that Dr. Herron-Williams failed to establish a prima facie case of race or gender discrimination because she had neither identified an adequate comparator outside her protected classes who was treated more favorably than she was, nor presented a convincing mosaic of other circumstantial evidence suggesting that ASU had

---

[3] Dr. Herron-Williams filed her first EEOC charge in March 2015, claiming that she was subjected to "discriminatory and hostile treatment" based on her age, race, and gender while she was supervisor of OMIA.  She also claimed that her termination from OMIA and nonrenewal of her FAR contract constituted unlawful retaliation for complaining about the discrimination in her August 6, 2014, email.  In January 2016, Dr. Herron-Williams filed a second EEOC charge based on the October 2015 pay cut, alleging that ASU unlawfully retaliated against her for protesting the discrimination and for filing her first EEOC charge.  Additionally, she claimed the pay cut itself constituted unlawful discrimination based on age or gender.  The EEOC issued her a notice of her right to sue on both charges.  Although she alleged age discrimination in her EEOC charges, she has sued ASU only for race and gender discrimination under Title VII.

[4] Dr. Herron-Williams conceded in the District Court that she failed to exhaust her administrative remedies—and thus that summary judgment was appropriate—with respect to Count IV of her amended complaint, because she failed to allege in either EEOC charge that ASU's nonrenewal of her FAR contract amounted to unlawful discrimination.

unlawfully discriminated against her.  *Herron-Williams v. Ala. State Univ.*, 287 F. Supp. 3d 1299, 1310–11 (M.D. Ala. 2018).  It then held that she failed to establish a prima facie case for retaliation based on either her August 6, 2014, email or her March 2015 EEOC charge because she could not show that her email was protected activity under Title VII, *id.* at 1316, or that her pay cut was causally related to her filing of EEOC charges, *id.* at 1322.

Dr. Herron-Williams now appeals.[5]  We review a grant of summary judgment *de novo*, construing all facts and drawing all reasonable inferences in the non-moving party's favor.  *Smelter v. S. Home Care Servs., Inc.*, 904 F.3d 1276, 1284 (11th Cir. 2018).  Summary judgment is appropriate only when no genuine dispute of material fact exists and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S. Ct. 2505, 2510 (1986).

## II.

Dr. Herron-Williams argues on appeal that the District Court erred in holding that she failed to make out a prima facie case of race and gender discrimination.  She claims that ASU discriminated against her based on her race and gender in violation of Title VII when it removed her from her position as

---

[5] We have jurisdiction to review the District Court's final order granting summary judgment under 28 U.S.C. § 1291.

supervisor of OMIA and cut her pay.  Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).[6]

Absent, as here, any direct evidence of race or gender discrimination, we evaluate claims of such discrimination based on circumstantial evidence using the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817 (1973).  Under the *McDonnell Douglas* framework, the plaintiff-employee bears the initial burden of establishing a prima facie case of discrimination.  *Id.* at 802, 93 S. Ct. at 1824.  To make out a prima facie case of race or gender discrimination, the employee must show that (1) she is a member of a protected class, (2) she was qualified for the position, (3) she suffered an adverse employment action, and (4) she was replaced by a person outside her protected class or was treated less favorably than a similarly situated individual outside her protected class.  *Maynard v. Bd. of Regents of Div. of Univs. of Fla. Dep't of Educ. ex rel. Univ. of S. Fla.*, 342 F.3d 1281, 1289 (11th Cir. 2003) (citing *McDonnell Douglas Corp.*, 411 U.S. at 802, 93 S. Ct. at 1824).

---

[6] The parties do not dispute that ASU is an employer covered by Title VII, and that Dr. Herron-Williams was an ASU employee at all times relevant to this suit.

12

Establishing a prima facie case gives rise to a presumption that the adverse action was discriminatory; the burden then shifts to the employer to offer some legitimate, nondiscriminatory reason for its actions. *McDonnell Douglas Corp.*, 411 U.S. at 802, 93 S. Ct. at 1824; *Smelter*, 904 F.3d at 1288. If the employer meets its burden of production, the burden then shifts back to the employee to show that the proffered reason was really a pretext for unlawful discrimination. *McDonnell Douglas Corp.*, 411 U.S. at 805, 93 S. Ct. at 1826; *Smelter*, 904 F.3d at 1288. "Although the intermediate burdens of production shift back and forth, the ultimate burden of persuading the trier of fact that the employer intentionally discriminated against the employee remains at all times with the plaintiff." *E.E.O.C. v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1273 (11th Cir. 2002) (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S. Ct. 1089, 1093 (1981)).

There is no dispute that (1) Dr. Herron-Williams, as a black female, is a member of two protected classes; (2) she was qualified for her position as supervisor of OMIA; and (3) she suffered an adverse employment action when she was removed from her supervisory position and her pay was reduced.[7] Therefore, we must decide whether there is any genuine dispute that Dr. Herron-Williams was

---

[7] ASU argued in the District Court that, under the circumstances of this case, Dr. Herron-Williams suffered no adverse employment action. The District Court rejected this argument, and ASU no longer contests the issue on appeal.

treated less favorably than a similarly situated individual outside of her protected class.

To establish a prima facie case and raise a presumption of discrimination, the preferentially treated individual from outside the plaintiff's protected class (the "comparator") must be similarly situated to the plaintiff in all material respects. *Lewis v. City of Union City*, 918 F.3d 1213, 1224 (11th Cir. 2019) (en banc). Although what constitutes a "material" similarity or difference will differ from case to case, a similarly situated comparator generally will have "engaged in the same basic conduct (or misconduct) as the plaintiff;" "been subject to the same employment policy, guideline, or rule as the plaintiff;" "been under the jurisdiction of the same supervisor as the plaintiff;" and "share[d] the plaintiff's employment or disciplinary history." *Id.* at 1227–28.

Here, Dr. Herron-Williams's immediate replacement as interim supervisor of OMIA was also a black female, a member of both of Dr. Herron-Williams's protected classes. So, Dr. Herron-Williams argues (as she must) that ASU's mere attempt to lure Dr. Havron back to OMIA to replace Dr. Herron-Williams as supervisor is enough to establish a prima facie case of race and gender discrimination. True enough, Dr. Havron, as a white male, is outside of both of Dr. Herron-Williams's protected classes, but he is not similarly situated to Dr. Herron-Williams in all material respects. Dr. Havron previously held the OMIA position

14

full-time and had nearly a decade of experience in that role, whereas Dr. Herron-Williams had been supervising OMIA on a temporary basis for only a few months. Dr. Havron's considerably greater experience and unique qualifications thus materially differentiated him from Dr. Herron-Williams with respect to the OMIA position, especially in light of the problems that OMIA faced processing student visas after Dr. Havron's retirement.[8]  For the same reason, he is also not an adequate comparator with respect to ASU's failure to grant Dr. Herron-Williams the PDSO designation.

Dr. Herron-Williams also has not shown that ASU treated Dr. Havron more favorably with respect to the equipment issues in OMIA—even if he was an adequate comparator—because ASU provided Dr. Herron-Williams with the same equipment that it provided to Dr. Havron.  Thus, because Dr. Havron is not an adequate comparator, and because Dr. Herron-Williams was ultimately replaced as

---

[8] The en banc Court decided *Lewis* after the District Court in this case granted summary judgment in ASU's favor, and so the District Court relied on our pre-*Lewis* standard for assessing whether Dr. Havron was an adequate comparator on Dr. Herron-Williams's discrimination claims.  *See Herron-Williams*, 287 F. Supp. 3d at 1313 (explaining that a plaintiff must identify a comparator who is "similarly situated to the plaintiff in all *relevant* respects" whom the defendant treated differently (emphasis added) (quoting *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1326 n.17 (11th Cir. 2011))).  Specifically, the District Court found that Dr. Havron was not an adequate comparator because he had supervised OMIA on a permanent basis for almost a decade by the time he retired, whereas Dr. Herron-Williams supervised OMIA only on an interim basis for less than a year.  *Id. Lewis* supports this conclusion.  In *Lewis*, we identified differences in employment history as a valid, material difference which would disqualify a plaintiff's proffered comparator.  918 F.3d at 1228.  Given the material difference in employment history and qualifications identified by the District Court and explained above, the District Court did not err in finding that Dr. Havron was an inadequate comparator.

15

interim supervisor of OMIA by an individual in both of her protected classes, Dr. Herron-Williams has not shown that ASU treated her less favorably than a similarly situated individual outside of her protected classes with respect to her treatment as supervisor of OMIA and her eventual removal from that position.

In addition, Dr. Herron-Williams cannot show that ASU treated a similarly situated employee differently with respect to her reduction in salary. As the District Court noted, the closest she comes to identifying an adequate comparator is Dr. David Iyegha, a black male.[9] Dr. Iyegha's administrative position was eliminated for the 2014–2015 academic year, but he continued to receive his higher administrative pay until shortly before he retired in September 2015. He thus continued to receive an administrative salary for approximately one year after no longer holding an administrative position. Dr. Herron-Williams continued to receive the administrative pay associated with her Interim Associate Provost position for over eighteen months after she was removed from that position, and for twelve months after her supplemental duties with OMIA came to an end. Therefore, even if Dr. Iyegha is an adequate comparator for her gender-discrimination claim, the evidence shows that Dr. Wilson extended Dr. Herron-

---

[9] The other employee Dr. Herron-Williams identifies as a potential comparator with respect to her pay-reduction discrimination claim is Dr. Sandra Walker. But Dr. Walker, as a black female, is a member of both of Dr. Herron-Williams's protected classes, and thus is not a proper comparator.

16

Williams's higher administrative salary for just as long as, if not longer than, he extended Dr. Iyegha's. Dr. Herron-Williams has therefore not shown that she was treated any less favorably than a similarly situated employee outside of her protected classes, and so she is not entitled to the presumption of discrimination under *McDonnell Douglas*.

To be sure, as Dr. Herron-Williams argues, "establishing the elements of the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011); *see also Wilson v. B/E Aero., Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004) ("The methods of presenting a prima facie case are not fixed; they are flexible and depend to a large degree upon the employment situation."). Even if a plaintiff cannot produce an adequate comparator, she will survive summary judgment if she presents "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Smith*, 644 F.3d at 1328 (alteration omitted) (quoting *Silverman v. Bd. of Educ.*, 637 F.3d 729, 734 (7th Cir. 2011)). "[S]o long as the circumstantial evidence raises a reasonable inference that the employer discriminated against the plaintiff, summary judgment is improper." *Id.*

17

For example, in *Smith* we held that the plaintiff presented sufficient circumstantial evidence to raise an inference that the plaintiff's race impacted his employer's decision to fire him. *Id.* at 1346–47. The white employee in that case offered evidence that his employer more leniently disciplined similarly situated black employees who engaged in "virtually identical" conduct (specifically, sending racist and racially insensitive emails), *id.* at 1341–43; that his employer had an incentive to fire white employees but not black employees who engaged in racially discriminatory conduct, given that the employer had been facing high-profile accusations by both civil plaintiffs and the federal government that it tolerated a racially discriminatory workplace, *id.* at 1344–45; and that his employer used a spreadsheet for making disciplinary decisions that included the employee's race in one column, thereby directly injecting race into the employer's decision-making process, *id.* at 1336, 1345–46.

But as the District Court correctly points out, Dr. Herron-Williams has not offered anything close to the mosaic in *Smith*. Dr. Herron-Williams presents evidence that various administrators at ASU gave her a hard time when she supervised OMIA, but she has not done enough to connect that negative treatment to her race or gender. To remedy the shortcomings described above, Dr. Herron-Williams points to ASU's shifting reasons (or, as she calls them, "patently false explanations") for why it declined to grant her the PDSO designation. Although

ASU's conflicting statements might raise questions about the competence or professionalism of ASU's administration, they are not enough to convert the other evidence into a mosaic of discrimination.  Unlike in *Smith*, there is nothing here from which to infer that ASU's decision not to authorize her PDSO designation, its decision to remove her from her position in OMIA and as ASU's FAR, and its decision to reduce her pay were motivated in whole or in part by Dr. Herron-Williams's race or gender.

Nor does the eventual appointment to the OMIA and FAR positions of individuals outside one of Dr. Herron-Williams's protected classes transform this evidence into a mosaic of discrimination.  Although the OMIA position was ultimately filled by a black male, Dr. Herron-Williams's immediate successor was a black female—a member of both of her protected classes.  And although the FAR position was eventually filled by a white female, it was only after two other black, female candidates were considered for the position—one of whom was actually selected—but ultimately could not accept.

ASU may not have treated Dr. Herron-Williams fairly, but Title VII does not "replace employers' notions about fair dealing in the workplace with that of judges."  *Flowers v. Troup Cty., Ga., Sch. Dist.*, 803 F.3d 1327, 1338 (11th Cir. 2015).  An employer may terminate an employee for "a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not

19

for a discriminatory reason." *Id.* (quoting *Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1187 (11th Cir. 1984)).  And Dr. Herron-Williams has failed to present evidence sufficient to show that ASU's mistreatment of her was based on her race or gender.  The District Court therefore properly granted ASU summary judgment on Dr. Herron-Williams's discrimination claims.

## III.

Dr. Herron-Williams also argues that the District Court erred in rejecting her retaliation claims.  She claims that ASU removed her from her position in OMIA, declined to renew her FAR contract, and cut her pay in retaliation for her August 6, 2014, email.  She also claims that Dr. Wilson exercised his discretion to cut her pay in retaliation for her filing her first EEOC charge.

## A.

With respect to the retaliation claims stemming from her email, the District Court held that Dr. Herron-Williams failed to establish a prima facie case of retaliation because her email was not a protected activity under Title VII.  Title VII's anti-retaliation provision makes it unlawful for an employer to discriminate against an employee because she has opposed unlawful discrimination.  42 U.S.C. § 2000e-3(a).  We evaluate Title VII retaliation claims based on circumstantial evidence under a similar burden-shifting framework as claims of substantive discrimination.  The employee must first establish a prima facie case of retaliation

20

by showing that "(1) the employee was engaged in statutorily protected activity; (2) the employee suffered an adverse employment action; and (3) a causal link exists between the protected activity and the adverse employment action." *Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1310 (11th Cir. 2016). Once an employee establishes a prima facie case of retaliation, the employer must then rebut the inference of retaliation by presenting a legitimate, non-retaliatory reason for the adverse employment action. *Id.* Once the employer does so, the burden shifts back to the employee to demonstrate that the employer's proffered reasons are pretextual. *Id.* at 1310–11.

Title VII's protections are not limited to formal complaints of discrimination; informal complaints may constitute protected activity as well. *Id.* at 1311. For a complaint to be considered a protected activity under Title VII, a plaintiff-employee must show that she "had a good faith, reasonable belief that the employer was engaged in unlawful employment practices." *Id.* (quoting *Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997)). This includes both a subjective prong—that the plaintiff in good faith believed the employer was engaged in an unlawful employment practice—and an objective prong—that her belief was objectively reasonable. *Id.* (quoting *Little*, 103 F.3d at 960). "The objective reasonableness of her belief is measured by reference to controlling substantive law." *Id.* (citing *Butler v. Ala. Dep't of Transp.*, 536 F.3d

21

1209, 1214 (11th Cir. 2008)).  While a plaintiff is not required to prove that the conduct complained of was actually unlawful, she must still show that the conduct opposed was "close enough to support an objectively reasonable belief that it is." *Id.* (quoting *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1351 (11th Cir. 1999)).

Here, even if Dr. Herron-Williams subjectively believed that ASU was engaging in unlawful discrimination, the conduct Dr. Herron-Williams alleged in her August 6, 2014, email is simply not close enough to race or gender discrimination to support an objectively reasonable belief that ASU was unlawfully discriminating against her.  In her email to Dr. Boyd, Dr. Herron-Williams complained that ASU's treatment of her was "unfathomable," and that it "cannot be explained."[10]  It is from this inexplicability that she apparently infers that "the intolerable actions of Dr. Wilson and a few other administrators can only be based on gender, age, or educational background if not race and ethnicity."  The only mention of discrimination in her entire fifteen-paragraph email is that single, conclusory sentence.  As the District Court noted, her email offers no other explanation for her accusations of discrimination.

---

[10] Even before this Court, Dr. Herron-Williams repeatedly characterizes ASU's actions as "bizarre" and "inexplicable."

22

An employer's "intent may be difficult to discern," *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 813 (11th Cir. 2010), but it is not objectively reasonable to presume that, simply because an employee has been subjected to seemingly inexplicable negative treatment, the true reason for the treatment must be unlawful discrimination. In other words, it is not objectively reasonable to infer race or gender discrimination merely from the lack of a clear reason for an employer's mistreatment of its employee. As discussed in Part II, *supra*, the allegations described in Dr. Herron-Williams's email are not close enough to unlawful discrimination to permit Dr. Herron-Williams to draw such an inference. Because she has failed to show that her August 6, 2014, email constituted protected activity, the District Court properly granted summary judgment on her retaliation claims stemming from that email.

### B.

With respect to the retaliation claims stemming from the filing of her EEOC charge, Dr. Herron-Williams argues that the District Court erred in finding that the pay reduction was too far removed temporally from that charge to support a case for retaliation. The District Court held that Dr. Herron-Williams failed to establish a causal link between her protected activity (the filing of her EEOC charge) and the adverse employment action (the pay cut) since at least two months had passed

23

between ASU becoming aware of the charge and the subsequent pay cut.[11]
*Herron-Williams*, 287 F. Supp. 3d at 1322.  It based its decision on a more lenient causation standard, requiring only a showing that (1) the decision-makers at ASU were aware of the allegedly protected conduct, and (2) the protected activity and the adverse actions were not "wholly unrelated."  *Id.* at 1318 (quoting *Shannon v. Bellsouth Telecomms., Inc.*, 292 F.3d 712, 716 (11th Cir. 2002)).  It did so because it questioned whether the higher but-for causation standard articulated by the Supreme Court in *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338, 362, 133 S. Ct. 2517, 2534 (2013), applied at the summary judgment stage.  *Herron-Williams*, 287 F. Supp. 3d at 1317–20.

But there can be no doubt after *Nassar* that, in order to survive summary judgment and be entitled to a jury trial, there must be a genuine dispute as to whether the protected activity was a but-for cause of the adverse employment action.  *See Nassar*, 570 U.S. at 362, 133 S. Ct. at 2534 ("[A] plaintiff making a retaliation claim under § 2000e-3(a) must establish that his or her protected activity

---

[11] As the District Court explained, it is unclear from the record when Dr. Herron-Williams contends that ASU became aware of the EEOC charge.  She filed her charge on March 9, 2015, and then amended it on March 10, 2015.  Under 42 U.S.C. §§ 2000e-5(b), (e)(1), the EEOC is required to notify an employer of the filing of an EEOC charge within ten days of filing, which would require notification by March 19, 2015, and March 20, 2015, respectively.  At the very least, we know that ASU became aware of the EEOC charge by July 1, 2015, when it filed its response to the charge.  The District Court, construing the two-to-six-month timeline generously, reasoned that even if ASU did not become aware of the charge until approximately two months before deciding to reduce Dr. Herron-Williams's pay in September 2015, Dr. Herron-Williams's retaliation claim would still fail on the issue of causation.

24

was a but-for cause of the alleged adverse action by the employer.").  In other words, to survive summary judgment here, there must be a genuine dispute that, but for Dr. Herron-Williams's filing of a charge of discrimination with the EEOC, ASU would not have reduced her pay.

The evidence in the record is insufficient to establish but-for causation.  Dr. Herron-Williams has relied throughout this litigation on a theory of temporal proximity: that it was not until after she filed her EEOC charge in March 2015 and after ASU responded to that charge in July 2015 that Dr. Wilson decided to reduce Dr. Herron-Williams's pay in September 2015.  But the two events are separated by several months in time and there is no other evidence in the record to connect them.  Accordingly, the District Court correctly held that no reasonable jury could conclude that the filing of the EEOC charge and the pay cut were causally related, let alone that Dr. Herron-Williams's filing of discrimination charges with the EEOC was a *but-for* cause of her pay reduction.[12]  Because Dr. Herron-Williams

---

[12] Attempting to side-step the timing issue, Dr. Herron-Williams argues that a reasonable jury could nonetheless find that Dr. Wilson and Dr. Boyd were already angered by the August 6, 2014 email—that "they hated being accused of discrimination and would take action to punish it"—and thus that "Dr. Wilson used his discretion to reduce [Dr. Herron-Williams's] pay because—having once been angered by a mere internal complaint—he was now infuriated even more by EEOC charges.  And that . . . was the real explanation for why Dr. Wilson used his discretion . . . to reduce Dr. Herron-Williams'[s] pay."  Not only did Dr. Herron-Williams not present this argument to the District Court below, but she has also failed to point to any evidence in the record suggesting such "anger" on the part of ASU or its administrators.  Summary judgment was therefore proper.

cannot establish this causal link, she has failed to establish a prima facie case of retaliation and summary judgment was proper.

## IV.

For the foregoing reasons, the judgment of the District Court is

**AFFIRMED.**